UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PTI ASSOCIATES, LLC, <br> Plaintiff, | : <br> : <br> : |
| v. | :     3:09-cv-849 (WWE) <br> : |
| CAROLINA INTERNATIONAL SALES <br> COMPANY, INC., d/b/a CISCO, <br> Defendant. | : <br> : <br> : |

**MEMORANDUM OF DECISION ON DEFENDANT'S
MOTION TO DISMISS AND MOTION TO TRANSFER VENUE**

Plaintiff PTI Associates, LLC has brought this action against defendant Carolina International Sales Company, Inc., d/b/a Cisco ("CISCO"), alleging that CISCO violated the Connecticut Unfair Trade Practices Act ("CUTPA") and Connecticut common law. Now pending are defendant's motion to transfer venue (Doc. #11) and motion to dismiss (Doc. #23). For the following reasons, the motion to dismiss will be granted in part and the motion to transfer venue will be granted in its entirety.

The Court likely has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332.[1]

**BACKGROUND**

For purposes of ruling on a motion to dismiss and a motion to transfer venue, the

---

[1] Plaintiff's amended complaint does not indicate who the members are of PTI Associates nor the citizenship of those members. Because diversity jurisdiction depends on the citizenship of a limited liability company's members, plaintiff is instructed to amend the jurisdictional statement supplementing the complaint with information that would substantiate the Court's exercise of jurisdiction under section 1332. See, e.g., Avnet, Inc. v. MTM Techs., LLC, 2009 U.S. Dist. LEXIS 90847 (D. Conn. Sept. 25, 2009) (discussing diversity jurisdiction concerning a limited liability company); 28 U.S.C. § 1653.

1

Court accepts all allegations of the amended complaint as true and also reviews the party's affidavits as to the motion to transfer venue.

Plaintiff is a limited liability company with a principal place of business in Connecticut. It produces ultra high purity ("UHP") acetonitrile.[2] Defendant is a corporation organized in Delaware with a principal place of business in North Carolina. It provides resources and services to the chemical manufacturing and chemical processing industries.

Plaintiff began operations as a producer of UHP acetonitrile in December 1998. Faced with frequent supply shortages, in early 2008, plaintiff decided to purchase co-product acetonitrile directly from an acrylonitrile producer and then have it processed by a third party to be purified into commercial quality. The resulting commercial grade acetonitrile would be used by plaintiff as a feedstock to produce UHP grades.

In January 2008, a telephone conference was held between Skip MacElhannon, plaintiff's Vice President of Business Development, Jerry Richard, plaintiff's Vice President of Marketing, and Norm Beaucamp, defendant's President. Following that call, plaintiff expressed its desire to find a process to refine the co-product acetonitrile purchased by plaintiff into UHP acetonitrile.

Beaucamp indicated defendant's willingness to develop the process and

---

[2] Acetonitrile is a chemical compound used in pharmaceutical manufacturing and in the production of synthetic rubber. Ultra high purity grades of acetonitrile have a purity of 99.95% with low trace impurities. Acetonitrile is a by-product or co-product in the manufacture of acrylonitrile. As a co-product, it is highly contaminated, having a concentration of only 50% to 75% and containing many other impurities and water. It can be purified to standard or commercial grade acetonitrile and then used as feedstock for the production of UHP acetonitrile.

represented that defendant would work with a custom processor on plaintiff's behalf to refine plaintiff's co-product acetonitrile into commercial grade acetonitrile. On February 28, MacElhannon and Richard met with Norm Beaucamp, Keith Beaucamp and Gary Dowell of Millennium International, LLC at defendant's office in Matthews, North Carolina. Plaintiff alleges that Millennium acted as an agent for defendant. At this meeting, Norm Beaucamp represented that although defendant was primarily a chemical trading company, defendant had formed a group to specialize in custom chemical process. Beaucamp further represented that he had many years of experience managing custom processing projects and that Bob Schory, a chemist with defendant, was skilled at using reaction chemistry as part of the acetonitrile purification process.

Beaucamp urged that an initial processing be done at the Haltermann Products facility in Houston, Texas, referring to Haltermann as the "Cadillac" of custom processors. Defendant arranged a meeting and tour of the Haltermann plant in April 2008 where representatives of plaintiff met with Jeff Weeks, Haltermann's project manager. Soon thereafter, it was agreed that Haltermann would run a small-scale laboratory trial run of defendant's refining process. On April 28, 2008, plaintiff signed a letter of intent to purchase the co-product acetonitrile output from an acrylonitrile manufacturing plant in Texas. An initial chemical processing campaign was planned for July 2008. After the small-scale laboratory run, Haltermann provided samples to plaintiff which met plaintiff's required specifications.

On June 3, defendant transmitted to plaintiff a proposal for an initial run of plaintiff's acetonitrile feedstock to be processed at the Haltermann facility. The

proposal represented that a run of approximately 800,000 pounds of co-product feedstock would yield approximately 543,500 pounds of finished commercial grade acetonitrile.  On June 27, plaintiff sent a purchase order to defendant for this run, which was scheduled to begin on July 15.

The purchase order contemplated plaintiff sending 700,000 to 875,000 pounds of co-product feedstock to defendant for purification at the Haltermann facility for a net yield of approximately 544,000 pounds of commercial grade acetonitrile.  Plaintiff arranged for 845,400 pounds of co-product feedstock, with an active weight – the amount of acetonitrile actually contained within the feed stock – of 665,743 pounds to be delivered to the Haltermann facility on or about July 22.  Defendant was to provide regular updates to plaintiff on the progress of the refining process and was to send plaintiff a sample of the commercial grade acetonitrile product for approval by plaintiff before sealing and shipping the remainder of the yield.  The purchase order also provided for specific purity and delivery requirements.

Due to a number of delays, Haltermann completed the run on October 10, 2008 and sent samples of the finished product to plaintiff, which was analyzed on October 14.  In total, plaintiff received only 404,160 pounds of commercial grade acetonitrile from this run, a yield 168,374 pounds less than defendant had agreed to provide under the terms of the purchase order.

During chemical processing, the processed stream of acetonitrile can be taken in different segments or fractions.  Some fractions may contain enough partially treated acetonitrile that the fraction may later be collected and reprocessed.  Without plaintiff's authorization, over 200,000 pounds of recycled stream acetonitrile fractions, which

could have been saved for a later campaign, were incinerated.

Defendant sent plaintiff another proposal on December 19, 2008, termed an "agreement for acetonitrile recovery." The second proposal envisioned an additional attempt at refining plaintiff's feedstock, to take place at a second chemical processing facility operated by KMTEX located in Port Arthur, Texas during the week of January 5, 2009. A purchase order for this second run was sent by plaintiff to defendant on December 22, 2008.

Under the terms of the purchase order, plaintiff sent approximately 340,000 pounds of co-product feedstock, estimated to have an active weight of 264,997 pounds to the KMTEX facility on December 23, 2008. Both the purchase order and the agreement specifically required defendant to account for a 90% "minimum yield" of the active weight acetonitrile either in finished commercial grade or in reusable recycled streams. Again, the purchase order required samples to be sent to plaintiff for its acceptance of the finished product.

Dowell was present at the KMTEX plant for the processing run. On the second day of the run, Dowell reported to plaintiff that the KMTEX facility was having pump problems and approximately ten times more sulfuric acid had been introduced into the process than was intended or advisable.

In another campaign, Dowell revealed to plaintiff that defendant was using the chemical xylene as the entrainer[3] for this campaign. The xylene used by defendant

---

[3] An entrainer is used to break an azeotrope during distillation. When properly used, one of the azeotrope components has a greater affinity to the entrainer and stays with the entrainer, allowing the other azeotrope component to be separated.

5

contained meta xylene isomer, which was an inappropriate form of xylene for this process. As a result, the meta xylene itself formed an azeotrope with the acetonitrile. Defendant failed to recognize that the acetonitrile and meta xylene azeotrope had combined; to date, defendant does not have any process to separate the acetonitrile and meta xylene isomer. The run was subsequently stopped, and the overly acidified and azeotroped acetonitrile was placed in a holding tank.

Due to delays at the Haltermann plant, plaintiff was forced to find another source of co-product acetonitrile. In December 2008, it signed a five-year contract with Cytec, an acrylonitrile manufacturer, to purchase Cytec's total co-product acetonitrile output. Prior to signing the agreement with Cytec, plaintiff consulted with defendant regarding the impurities in the Cytec stream. Defendant informed plaintiff that Haltermann would not accept the Cytec unless it was treated beforehand to reduce specific impurity levels. Defendant then told plaintiff that it would work with KMTEX to process the Cytec stream. The week before signing the agreement with Cytec, plaintiff asked defendant if it could process the stream should the agreement go forward. Defendant, through Dowell, responded that it could by developing a process to effectively remove the relevant impurities. Therefore, plaintiff signed the agreement, agreeing to collect Cytec's acetonitrile beginning on January 20, 2009.

Plaintiff became concerned about whether defendant and KMTEX were prepared to process plaintiff's Cytec stream. Over the next several weeks, plaintiff continued to press defendant to move forward with the processing of the Cytec stream. In January 2009, Dowell admitted that defendant had not developed an effective process to recover the Cytec stream. Dowell acknowledged that defendant had been concerned

6

with removing one impurity and had overlooked problems related to another impurity. After the execution of the agreement with Cytec, Dowell told plaintiff that distillation of the second impurity would foul up the column and would require more investment. Plaintiff responded that they had already invested substantial sums of money to accumulate the Cytec stream and that defendant's failure to develop an effective process could cause financial harm to plaintiff. Soon thereafter, plaintiff received an email from Norm Beaucamp stating that defendant could no longer extend credit to plaintiff for future campaigns.

## DISCUSSION

**I.     Motion to Dismiss**

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King, 467 U.S. 69, 73 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff is obliged to amplify a claim with some factual allegations to allow the court to draw the reasonable inference that the defendant is liable for the alleged conduct. Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937 (2009).

## A. Count Five – Breach of Fiduciary Duty

The fifth count of plaintiff's amended complaint asserts that defendant breached its fiduciary duty to plaintiff.

A fiduciary duty exists where "the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 38 (2000). Such a relationship is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." Biller Assocs. v. Peterken, 269 Conn. 716, 723 (2004). A fiduciary duty is absent as a matter of law where "the parties either deal at arm's length, thereby lacking a relationship of dominance and dependence, or the parties do not engage in a relationship of special trust and confidence." Golden W. Ref. v. PriceWaterhouse, 392 F. Supp. 2d 407, 414 (D. Conn. 2005).

In the amended complaint, plaintiff alleges that it relinquished control over its co-product acetonitrile to defendant. In addition, plaintiff alleges that defendant retained complete control over its interactions with Haltermann and KMTEX, and thus, plaintiff was unable to protect its interests during the scope of the relationship.

One party's total dependence on the other does not create a fiduciary duty. See Int'l Connectors Indus. v. Litton Sys., 1995 U.S. Dist. LEXIS 5769, *17 (D. Conn. Apr. 25, 1995). In Golden W. Ref., the Court granted summary judgment on a similar claim, finding that plaintiff had failed to allege any fact "suggesting a relationship of special trust or dependence beyond the run-of-the-mill commercial reliance of one company on

8

the services of another." Golden W. Ref., 392 F. Supp. 2d at 414. The same is true here. Moreover, as the Connecticut Supreme Court has pointed out, "Superior skill and knowledge alone do not create a fiduciary duty among persons involved in a business transaction." Hi-Ho Tower, 255 Conn. at 42; see also Golden W. Ref., 392 F. Supp. 2d at 414. Further, although plaintiff may have relinquished control of its crude acetonitrile and entrusted it to defendant, there is no allegation that the negotiations were not at arm's length. See Hi-Ho Tower, 255 Conn. at 41-42 ("The fact that one business person trusts another and relies on the person to perform its obligations does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty."). These cases, however, were all decided following discovery, either after trial or on summary judgment.

The Connecticut Supreme Court has cautioned that the existence of a fiduciary duty is a question of fact and has not specifically defined it as a matter of law. See Dunham v. Dunham, 204 Conn. 303, 320 (1987) ("Rather than attempt to define a fiduciary relationship in precise detail and in such a manner to exclude new situations, we have instead chosen to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other."). At this stage, it would be inappropriate to determine as a matter of law that the parties did not have a fiduciary duty. See XL Specialty Ins. Co. v. Carvill America, Inc., 2007 Conn. Super. LEXIS 1376 (Conn. Super. Ct. May 31, 2007) ("Contractual terms ... do not necessarily negate a fiduciary relationship if one inheres in the relationship."). Therefore, the Court will deny the motion to dismiss at this stage. See WEB Mgmt. LLC v. Arrowood Indem. Co., 2008 U.S. Dist. LEXIS 16768 (D. Conn. Mar. 5, 2008); Oak

9

River Co. v. Ferreri, 2002 U.S. Dist. LEXIS 17670 (D. Conn. Aug. 29, 2002).

While the Court is skeptical of the ultimate merits of plaintiff's breach of fiduciary duty claim, it cannot dismiss that claim at this stage. Instead, it will leave plaintiff to its proof on this claim.

### B. Count Six – Violation of CUTPA

Defendant also moves to dismiss plaintiff's CUTPA claim on the grounds that plaintiff has failed to allege that any of the unfair and/or deceptive acts or practices occurred within Connecticut. A claim under CUTPA requires that plaintiff allege that defendant engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b. CUTPA defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value in this state." Conn. Gen. Stat. § 42-110a. CUTPA further requires that the tortious conduct occur in Connecticut. See Uniroyal Chem. Co. v. Drexel Chem. Co., 931 F. Supp. 132, 140 (D. Conn. 1996).

There are two approaches that courts have employed to evaluate whether a violation of CUTPA occurred in Connecticut. First, this Court has previously held that CUTPA is violated where the violation "is tied to a form of trade or commerce intimately associated with Connecticut...." Victor G. Reiling Assocs. v. Fisher-Price, Inc., 406 F. Supp. 2d 175, 200 (D. Conn. 2005). Alternatively, where Connecticut choice of law principles are applicable, those principles dictate the application of Connecticut law, which provides that a tort is deemed to have occurred where the "economic impact" of

10

the injury is felt.  Uniroyal Chemical, 931 F. Supp. at 140.

Plaintiff argues that the amended complaint alleges that defendant's violations of CUTPA have an economic impact in the state of Connecticut.  It relies on the Court's decision in Titan Sports v. Turner Broad. Sys., where the Court denied a motion to dismiss a CUTPA claim, finding that plaintiff had alleged sufficient unfair trade practices in Connecticut.  In Titan Sports, the Court found sufficient practices because defendant had aired television programs and marketed advertisements in the state of Connecticut, in addition to plaintiff's principal place of business being in Connecticut.  See Titan Sports, 981 F. Supp. 65, 72 (D. Conn. 1997); see also Federici v. Gans, 1999 Conn. Super. LEXIS 169, *4 (Conn. Super. Ct. Jan. 7, 1999).

In the instant case, plaintiff's allegations of economic impact within the state are limited to those related to plaintiff's principal place of business being in Connecticut.[4]  This limited allegation is insufficient to establish a cause of action under CUTPA.  Therefore, the Court will dismiss this claim without prejudice.  Plaintiff will be permitted fourteen days following the transfer of this case to the Western District of North Carolina to file an amended complaint asserting sufficient further allegations to state a claim under CUTPA, if appropriate.

---

[4] The Court would reach the same decision if this analysis was done under the "intimately associated" rubric.  Plaintiff's allegations simply do not reach the level required to assert a CUTPA claim.

### C. Application of the Economic Loss Rule

Defendant argues that counts three (negligence), four (conversion), five (breach of fiduciary duty), six (violation of CUTPA) and seven (misrepresentation) should be dismissed because the economic loss rule prohibits the recovery in tort for economic damages arising from the breach of a contract.[5]

"The economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic." ODP, LLC v. Shelterlogic, LLC, 2007 Conn. Super. LEXIS 3482, *4 (Conn. Super. Ct. Dec. 21, 2007). Connecticut courts have applied the economic loss doctrine to bar tort claims arising from disputes between sophisticated parties when the same conduct underlies the tort and contractual claims causes of action. See Cornwall Bridge Pottery, Inc. v. Sheffield Pottery, Inc., 2008 U.S. Dist. LEXIS 26336, *4 (D. Conn. Apr. 2, 2008) (citing cases).

The Connecticut Supreme Court first applied the economic loss doctrine in Flagg Energy Dev. Corp. v. GMC, Allison Gas Turbine Div., 244 Conn. 126 (1998). That decision was arguably limited to contracts falling under the Uniform Commercial Code. There has been no appellate decision in Connecticut since Flagg Energy to clarify whether that decision applies to non-UCC contracts. This Court ruled that the economic loss doctrine applies to contracts for the performance of a service. See Hudson River Cruises v. Bridgeport Drydock Corp., 892 F. Supp. 380, 386 (D. Conn.

---

[5] Plaintiff's misorders its claim in the amended complaint, going from count five to count seven to count six. The Court will adhere to these labels in the interests of clarity and consistency.

12

1994) (citing Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752 (5th Cir. 1989)). Further, the decision in Flagg Energy relied on Princess Cruises v. GE, 950 F. Supp. 151 (E.D. Va. 1996), in which the court applied the economic loss rule to a non-UCC contract. But see Factory Mut. Ins. Co. v. Pike Co., 2009 U.S. Dist. LEXIS 58655, *8 (D. Conn. July 6, 2009) (declining to apply economic loss doctrine to a non-UCC contract due to absence of clear authority)

Therefore, the Court will dismiss plaintiff's tort claims to the extent that they seek damages arising from the breach of the parties' purchase agreements, even though the parties' agreement does not fall within the UCC. See Am. Progressive Life & Health Ins. Co. v. Better Benefits, LLC, 292 Conn. 111, 119 (2009) (remarking that economic loss rule does not bar a claim for tortious conduct falling outside the scope of a contract). Reviewing plaintiff's amended complaint, the Court will dismiss counts three, five and six. At this stage, the Court does not read count four (conversion) as being precluded by the economic loss doctrine insofar as it alleges that defendant misappropriated property that properly belonged to plaintiff. The Court does not know at this point whether the parties' agreement covered the return of the relevant acetonitrile. Count seven (misrepresentation), on its face, stems from the Cytec stream. The Court cannot determine at this stage whether this tort stems from the same contract as that underlying the KMTEX and Haltermann processes. Therefore, the Court will not dismiss it at this point.[6]

---

[6] The results would be the same in North Carolina because North Carolina has also adopted the economic loss rule. See, e.g., Moore v. Coachmen Indus., 499 S.E.2d 772, 780 (N.C. Ct. App. 1998).

## II. Motion to Transfer Venue

Defendant moves to transfer venue under 28 U.S.C. § 1404. Because jurisdiction in this case is based upon the diversity of citizenship of the parties, section 1391 governs the venue of this action. Section 1391(a) provides:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

In its complaint, plaintiff asserts that venue is appropriate before this Court under 28 U.S.C. § 1391(a)(2).

When the court possesses personal jurisdiction over defendant, the question of venue is evaluated under an interest of justice of 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."). A district court is given broad discretion in making determinations of convenience and fairness under section 1404(a). D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006); Hawley v. Accor N. Am., Inc., 552 F. Supp. 2d 256, 258 (D. Conn. 2008). In this analysis, the court considers the following factors: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the

attendance of unwilling witnesses, [and] (7) the relative means of the parties." D.H. Blair, 462 F.3d at 106-07. Courts have also examined "the forum's familiarity with the governing law" and "trial efficiency and the interest of justice, based on the totality of the circumstances." Jones v. Walgreen, Co., 463 F. Supp. 2d 267, 271 (D. Conn. 2006). "The burden of justifying transfer of venue lies with the moving party, who must make a clear and convincing showing that transfer should be made." Paragon Realty Group LLC v. LeCates, 2007 U.S. Dist. LEXIS 11458 (D. Conn. Feb. 5, 2007). Plaintiff's choice of forum should control absent a "strong case for transfer." Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 521 (2d Cir. 1989).

Defendant argues that a transfer to the Western District of North Carolina is appropriate because (1) it would be more convenient for more witnesses if this case proceeded in North Carolina; (2) the events of this case took place, for the most part, in North Carolina and Texas, not in Connecticut; and (3) the documentary evidence is in North Carolina and Texas, not in Connecticut.

### A. Plaintiff's Choice of Forum

Plaintiff presumably chose to litigate in this Court because its principal place of business is in the state of Connecticut. Based on the complaint, the parties' agreement was first negotiated telephonically. In addition, a meeting took place between the parties in North Carolina; at no point in the formation of the agreement did defendant's representatives travel to Connecticut. Additional meetings took place in Texas at the respective chemical facilities. Plaintiff's choice is not one substantively related to the merits of this case, but one of convenience. See TM Claims Service v. KLM Royal

15

Dutch Airlines, 143 F. Supp. 2d 402, 404 (S.D.N.Y. 2001) ("[A] plaintiff's choice of forum is given less weight where the case's operative facts have little connection with the chosen forum."). Because none of the events that gave rise to the events of this case took place in Connecticut; they occurred in North Carolina and in Texas, this factor is neutral with regard to transfer.

### B. Convenience of the Witnesses

The location of the witnesses and the convenience to the court for them is an important factor in deciding whether to transfer a case. See Ford Motor Co. v. Ryan, 182 F.2d 329, 331 (2d Cir. 1950). To assess the convenience of the witness, the court examines the number of witnesses, their respective residence and the "materiality, nature, and quality of each witness." Royal & Sunalliance v. British Airways, 167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001); see also Argent Funds Group, LLC v. Schutt, 2006 U.S. Dist. LEXIS 60469, *14 (D. Conn. June 27, 2006).

Defendant identifies nine potential witnesses, employed by defendant, Haltermann and KMTEX. These witnesses are located in North Carolina, South Carolina, Ohio, Georgia, New Jersey and Texas (four potential witnesses). Defendant's employees who are likely to testify are concentrated in North Carolina, South Carolina and Georgia. The New Jersey witness was the broker who arranged many of the meetings between the parties and the chemical processors in Texas. The Texas witnesses are affiliated with the two chemical processors who were to manufacture the acetonitrile. Plaintiff does not identify any potential witnesses, but the Court assumes that plaintiff would likely call Skip MacElhannon and Jerry Richard, who the Court assumes reside in or near Connecticut, where plaintiff is headquartered. Because the

16

party witnesses are likely of equal importance to the case and the non-party witnesses are located closer to North Carolina than to Connecticut, this factor favors transfer.

### C.      Location of Relevant Documents

Both parties' documents are located in their home states.  Courts have repeatedly found that, given the ease of electronic data storage and transfer, for documents that are easily mobile, this factor is not as important as it once was.  See, e.g., Hawley, 552 F. Supp. 2d at 260; Am. Steamship Owners Mut. Protection & Indent. Ass'n, Inc. v. Lafarge N. Am., Inc., 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning and emailing documents.").  Accordingly, this factor does not weigh for or against transfer.

### D.      Convenience of the Parties

"District Courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis."  D.H. Blair, 462 F.3d at 106.

Defendant's corporate headquarters are in North Carolina.  In addition, Keith Beaucamp works out of his home in Georgia doing bookkeeping and accounting work for defendant.  For plaintiff, it would be obviously inconvenient to transfer this litigation from Connecticut, where its witnesses and operations are based, to North Carolina.  As both parties are sophisticated corporate entities, and neither alleges that it is less able to travel, this factor does not weigh for or against transfer.

### E. Locus of Operative Facts

The facts of this case stem from a contract that was performed in Texas. In addition, negotiations in the formation of the contract were done over the telephone, through a meeting at defendant's office in North Carolina and through trips to the facilities in Texas. Because the parties met in North Carolina and never in Connecticut, this factor weighs in favor of transfer.

### F. Ability to Compel Unwilling Witnesses

The parties' proposed witnesses include individuals who are not employees of the parties. The ability to compel unwilling witnesses is only relevant for potential witnesses whose presence the court would need to compel because "employees of the parties will as a practical matter be available in any venue by virtue of the employment relationship." BRMS, LLC v. North Am. Flight Services, 2006 U.S. Dist. LEXIS 28830, *15 n.3 (D. Conn. May 12, 2006). At this point, neither party has asserted that any witness is unwilling to travel to Connecticut. See A Slice of Pie Prods. v. Wayans Bros. Entm't, 392 F. Supp. 2d 297, 308 (D. Conn. 2005) (finding it irrelevant on motion to transfer based on speculation as to whether witnesses would be willing to travel to court). Further, both Bridgeport, Connecticut and Charlotte, North Carolina, the seat of the Western District of North Carolina, are more than one hundred miles from Texas and outside the scope of the Court's subpoena power. See Fed. R. Civ. P. 45(c)(3)(A)(ii). This factor, thus, does not weigh for or against transfer.

### G. Relative Means of the Parties

The "relative financial hardship on the litigants and their respective abilities to

prosecute or defend an action in a particular forum are legitimate factors to consider." Michelli v. City of Hope, 1994 U.S. Dist. LEXIS 10755, *3 (S.D.N.Y. 1994). As mentioned above, neither party claims to lack the financial ability to try this case in the other's desired forum and the parties admit that they are of similar economic means. Therefore, this factor does not weigh for or against transfer.

In light of the fact that none of the events leading to this suit occurred in Connecticut and that more witnesses are located closer to the Western District of North Carolina than this Court, the Court finds that the interests of justice demand that this case be transferred to that Court. Therefore, the Court will grant defendant's motion. In doing so, the Court takes no position on plaintiff's suggestion in its opposition brief that venue is more appropriate in Texas than in North Carolina.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion dismiss (Doc. #23) in part and defendant's motion to transfer venue (Doc. #11). The Clerk is instructed to transfer this case to the Western District of North Carolina.

Dated at Bridgeport, Connecticut, this 26th day of January, 2010.

                                            /s/
                                    Warren W. Eginton
                                    Senior United States District Judge